I would like to reserve about three minutes for rebuttal. Three minutes. Thank you. Good morning, Your Honors. If it pleases the Court, my name is Timothy Power. I represent the Appellant Contract Management. Get yourself right behind the mic, would you? Okay, thank you. I represent the Appellant Contract Management in this matter. This matter arises out of a contract that was set aside for HUBZones, a janitorial contract at Navy facilities at Honolulu. My client, Contract Management, had been performing the contract for a number of years under a small business set-aside. When the government moved this to a HUBZone set-aside, it was precluded from bidding on it. The history of it was that this solicitation was issued as a small business set-aside. There was a call from a HUBZone business questioning whether this could be set-aside for HUBZones. The SBA and the contracting officer reviewed the regulations and decided that it was mandatory that this be set-aside as a HUBZone. It was changed to a HUBZone set-aside. Does it make a difference? What if it had been discretionary? Couldn't they still have done it? Well, they could have, except that in the record there's indication that when the HUBZone firm called up and asked about it being set-aside as a HUBZone, the contracting officer didn't want to do that. They initially were going to respond and say this has historically been set-aside for small businesses and they wanted to preserve that. It was only when the contracting officer was told by the SBA that, no, you have to set this aside as a HUBZone, that it was changed from the small business to a HUBZone set-aside. So I think it was clear that if there had been discretion at that time, it would have remained a small business set-aside. Contract management challenged the SBA and the federal acquisition regulations that clearly make this mandatory on the grounds that the Small Business Act, which authorized the set-aside, did not make it mandatory, but it was discretionary. The district court ruled against us and held that the language of the Act itself made this mandatory. So this was not a case where we looked at whether the interpretation of the agency was reasonable in enacting the regulations. The district court found the Act itself made it mandatory. And the language is in 15 U.S.C. 657A. The language is that a contract opportunity shall be awarded pursuant to this section on the basis of competition restricted to qualified HUBZones, small business concerns if, and then there are some conditions about a threshold level and that there be at least two HUBZones that would bid. And the district court interpreted that language that that mandated a set-aside under the HUBZone provision if there were two HUBZone businesses and if that threshold was met. Now, if the agency interprets it that way and it's a reasonable interpretation, even though it might otherwise be interpreted as you would like it interpreted, how much deference do we give to the agency in that circumstance? Well, it's my position that we don't have to worry about the deference in this case because the agency didn't interpret any language that was ambiguous or uncertain or unclear or didn't address the issue. The district court found that the Act itself did specifically address the issue and that the Act itself made the set-asides mandatory. So we aren't really dealing with a situation where we have to look to the deference of the agency. Well, somewhere in the agency they decided it was mandatory. Right. But they decided it was mandatory based upon the same interpretation that the district court did, that the statute made it mandatory, not that it was a left open. And I believe in the Chevron case, which talks about the deference, it starts out with the first position, is that if the position or intent of Congress is clear in the Act itself and addresses the issue that is governed by the regulations, then we don't have to get to the issue of deference to the agency because it's the Act itself that is guiding it. Now, you think there's only one possible interpretation for that language? Well, I do, Your Honor. And the reason for that is that I believe that the district court essentially took the language out of context and didn't consider it within the overall and overriding purpose of the Small Business Act, which is a rather large, comprehensive Act which covers lots of things, way beyond what we're dealing with here. But it does deal with government contract set-asides. And I believe that if you look at the Act and try to give meaning to all portions of the Act and all of the other provisions of the Act and the overall intent of Congress, that the only reasonable interpretation of this is that the language which says that the contract shall be awarded refers to the requirement for competition rather than the requirement that it have to be set aside under the HUBZone. And there's a number of reasons. It doesn't say shall be awarded to HUDZone businesses? It says it shall be awarded pursuant to this section. So Section 657 has at least two parts to it on set-asides. The first part of that section is clearly discretionary, where they can do sole source awards without any competition. That doesn't apply here. What's that? That doesn't apply here. That doesn't apply here. This is the second section which comes after the sole source, clearly discretionary one, and says it doesn't say that it has to be awarded to a HUBZone. It says if the contract's awarded pursuant to this section, then it has to be done under competition. And it's ---- If there is competition between two HUBZone businesses, then it has to be awarded to one of the two of them. Yes, that's correct. Well, but the question, I believe the question is ---- It can't be awarded to a prior 8A beneficiary. No. It can't be awarded to any other small business at all. No, that's correct, Your Honor. But the reason I think that what it's talking about in the second part, where you have the first part that's clearly discretionary sole source, the second part which is you have two or more and a threshold is met, then you have to have competition, that language closely parallels the language under the 8A program, which were the only other set-asides for a specific group that existed in the Small Business Act at that time. And that section's a lot longer than this section. It has a lot of other things in it. But it's dealing with economically and socially disadvantaged businesses owned by socially and economically disadvantaged. And in that section, you have originally only a discretionary sole source awards. And then that was changed so that now the SBA, if the same thresholds that apply in the HUBZone Act apply to an 8A program for economically and socially disabled, then the SBA and the contracting office have to award that contract under competition among 8A firms. So there's a close parallel between the language that they had and the structure that they had before they enacted the HUBZone program. In the 8A program, which everybody agrees is discretionary, when they enacted the HUBZone, they used almost the identical language. I will agree it's not the identical language, but there's a very small change in the language, and I don't think that that shows an intent by Congress to make a radical change from what had existed before that. Because if the HUBZone is interpreted as being mandatory, it's the only set-aside that's mandatory. So it's unique. I mean, it's significantly different than any other set-aside. And I don't think that the small change in language between the 8A and the HUBZone program shows an intent that Congress intended that there be such a radical change. The other things that I would say... You don't say that the HUBZone, being a later enactment, trumps the 8A selection. Well, no, I don't think it does. I noticed... Well, no, I don't think it does for a variety of reasons. One, there's nothing in the legislative history that shows that Congress intended it to be mandatory. There's a lot of talk in the legislative history that they were concerned about how the 8A program and the HUBZone program would interact with each other. But that makes sense, because the 8A program is directed towards businesses that are owned by economically and socially disadvantaged people, and the HUBZone program is aimed at trying to employ people in economically disadvantaged areas.  But the HUBZone owner can be somebody who's owned... Oh, yes, it can be. But I think that Congress recognized that there was a good chance there was going to be a lot of overlap between those businesses, and they didn't want to harm the 8A programs that might be in HUBZones when they enacted the HUBZone program. I think they wanted those two to clearly not one trump the other, as you said. I think they wanted them to coexist. But there's nothing to show in that legislative history where they're concerned about the 8A program that they think in any way that the HUBZone program is going to be a preference over any other program. I think their concern about the 8A was because they saw this nexus between the economic disadvantage in both of them. Let's take your position. What is the contract officer to do in that situation? He has HUBZone applicants, at least two of them, in competition, and he has 8A applicants for the same job. Are you saying that he should take into consideration other elements besides HUBZone and 8A in making up his mind? Well, if the HUBZone and the 8A programs were discretionary, then yes, the contracting officer could consider. I mean, if they're discretionary, the contracting officer could consider any kind of a set-aside for veterans, just a small business set-aside, or HUBZone or 8A. He could consider anything. But does the Act give him some hierarchy of preferences which he should follow? Not with regard to the 8A and the HUBZone. So he has perfect discretion, one over the other? Yes. I believe so, yes. So if there's a remand here, and we say remand to exercise your discretion, you'd be satisfied? Yes, I would. Now, your client's not an 8A either, is he? No. My client was just an ordinary small business. And as a matter of fact, he couldn't qualify for the HUBZone because there's a requirement that you have to have 35% of your employees living in a HUBZone. My client's located in Hawaii, didn't have 35% of his current employees in a HUBZone. They only do business in Hawaii. He essentially would have had to fire his employees to try to hire people in HUBZones to qualify, and he didn't want to do that. But that's one of the problems I have as a practical matter. Given the last question you asked, the answer you gave to Judge Fletcher, I'm more of a quandary. I'm sorry. Because if we remand for the contract officer to exercise his discretion as to whether awarding a HUBZone or 8A. No, I think if there's discretion and it's remanded and the contracting officer had the discretion that they had originally, which was that they wanted to award it just under a small business set-aside, I think the contracting officer should have the discretion to choose which contract type or set-aside type best carries out the intention of Congress when they set up these set-asides. And that's one of the difficulties as a practical matter I have with making these mandatory, is that it means that even if a contract is solicited somewhere where there's no HUBZones near it and there's no possibility, realistic possibility, that anybody on that contract is going to be hired from a HUBZone, if two HUBZone companies bid on it and it meets the dollar threshold, then the contracting officer has to use a HUBZone set-aside, even though as a practical matter there's not going to be any employment of HUBZone residents, which is the whole purpose of the Act. So I think the discretion the contracting officer needs to have is to look at these contracts and say, well, here's a contract that is located near a HUBZone. This would be a good contract to put under the HUBZone program. Or here's a contract that has to be performed at the company's home office rather than on a military facility. So that would be a good contract to set aside under the HUBZone, because then the HUBZone business will be hiring people from that area. To award a contract, and a lot of military bases are out in the middle of nowhere, as we all know, and there may be no HUBZones anywhere near them, and as a practical matter it won't increase the employment. But that's not the situation here. Well, it may be the situation here. We don't know. My client who was performing this contract had about 10 percent of his employees from the HUBZone. There's no guarantee on this contract. For instance, if you've got a HUBZone who qualifies in Detroit because they're in a HUBZone, bids on a contract in Hawaii, I mean, clearly they're not going to ship their employees, move employees from Detroit to Hawaii to perform the contract. There was no showing at all that there were significant, and I believe in Hawaii there aren't very many HUBZones, there was no showing that if this contract was awarded to a HUBZone, that there would be any significant HUBZone employees. As a matter of fact, I believe that the company that followed on to my client followed the usual practice in these areas, which is they hired my client's former employees to perform the work, because they were all trained, knew the work and all. So in fact, I believe as a practical matter, you substituted a HUBZone company for a small business, but the employees remained the same. All that changed was maybe some management, and now it's owned by a HUBZone company, but the HUBZone company has no physical nexus to where the work is being performed, which I think is one of the problems with these contracts. That may be a problem with Congress and the statute. Well, no, I understand that, Your Honor. I'm saying that's a practical reason, but I believe that's a practical reason why Congress wouldn't have wanted this to be interpreted as mandatory, why they didn't say it was mandatory, because it does have this lack of any control over where the work is going to be done. But I believe there were other things also. One of them is that you asked earlier about, isn't the fact that there was an enactment of the HUBZone after the 8A trumpet. Well, as I pointed out in the reply brief, Congress has now put in another set-aside, which is the Service Disabled Veterans Organization set-aside, which follows very much the same pattern. You can have a sole source award to one Service Disabled Veterans Organization. If there's more than two, it's more discretionary language. It says it may be done on the basis of competition if there are two. In that act, it says preferences with other set-asides or other programs, and the only two programs it mentions is you can't put a program over to the Service Disabled Veterans Organization if the contract's being performed under prison industries or under the Javits-Wagner-O'Day Act, which is for disabled people. It doesn't mention HUBZones. It doesn't mention that you have to give any preference to HUBZones. It doesn't talk about any other program at all. And I don't think when Congress enacted it. So if we're saying one trumps the other, we have to sort of look at this, I think, and say, well, now we've got a new enactment, which doesn't in any way refer to any preferences for HUBZones. And the case that the government cited. Close to your three minutes. Okay. All right. Well, thank you. May it please the Court. I'm Eric Miller from the Department of Justice on behalf of the Appellees. Your Honors, this case is controlled by the plain language of Section 657A, B2B, which provides that contract opportunity shall be awarded pursuant to this section on the basis of competition restricted to qualified HUBZones, small business concerns. Now, your opponent says that that shall applies to competition, not to mandatory award to that category. How do you answer that? I think there are two responses. First, as a matter of ordinary language, when you have a sentence that says someone shall do something, and then it's followed by two prepositional phrases pursuant to the section on the basis of competition, the natural reading is that both of those phrases are part of the shall, or both of those things are required. And second, even if it were possible to read the statute in the way that Appellant suggests, here the agency has adopted an interpretation of the statute in the context of a regulation that was issued through notice and comment rulemaking. And so under Chevron, the agency's interpretation of the statute has to be upheld unless, you know, an alternate reading is not merely permissible but compelled. And I don't think that Appellant has come close to showing that the agency's reading of the statute is unreasonable in any way. What was the problem that Congress was addressing? The problem was unemployment in HUB Zones. The legislative history refers to this program as a jobs program and a welfare-to-work program. This was enacted in 1997, just a year after the Welfare Reform Act. And Congress wanted to give businesses an incentive to locate in HUB Zones and to employ people there. And Congress could reasonably have thought that the best way to give that incentive to businesses was to give them the assurance that these set-asides would be mandatory so they could locate there and know for sure that they would get the benefit of the HUB Zone set-aside without having to rely on the discretion of a contracting agency. Look at the example that opposing counsel gives that a Detroit company could qualify to bid on a contract in Hawaii. Is that possible under this statute? It is possible as a theoretical matter. I think, though, as a practical matter, and again, these are by definition small businesses, and for service contracts like the one at issue here, I don't think it's very likely that you're going to have janitorial companies in Detroit bidding on contracts in Hawaii. But there's nothing in the statute that restricts where the work is to be done. But doesn't the HUB Zone classification require two things, one, that the location of the business be in the HUB Zone, and two, that the employees of the company also live in the HUB Zone? At least 35 percent of the employees must live there. Thirty-five percent of the employees have to live there. That's correct. But it says nothing about the employees that are actually put on the job. That's right. So there could be different employees. But again, these are not going to be huge corporations that have a really large number of employees in the first place. Now, the appellant has made much of the comparison between the language in the Section 8A program, which is discretionary, and the language in the HUB Zone program. And it's true that you can find the same phrase about shall be awarded in both statutes. But what makes the 8A program different is that the first sentence of 8A is, it shall be the duty of the administration, and it is empowered whenever it determines such action is necessary and appropriate. And then it lists four things that the agency can do relating to the 8A program, one of which is the shall be awarded language. So in the 8A program, you only get to that shall be awarded after the agency has exercised its discretion under the first sentence of the section to place a contracting opportunity into the 8A program. In the HUB Zone statute, Congress repeated that mandatory shall be awarded language, but it did not repeat the discretion conferring language of whenever it determines such action is necessary and appropriate. So I think far from suggesting that the HUB Zone program is discretionary, that parallelism in language really highlights the fact that Congress made the HUB Zone program mandatory by not repeating the discretionary language. With respect to the Veterans Benefits Act on which appellants rely, again, that statute is similar to the HUB Zone statute, except that it says that contracts may be awarded on the basis of a set-aside to service disabled veterans. So, again, the use of may there simply highlights that Congress understood the distinction between saying shall and saying may, and in the HUB Zone statute it chose to say shall. If the Court has no further questions, we ask that the judgment be affirmed. Thank you very much. Mr. Power, you have three minutes. Well, just to address a couple of things which Your Honors asked, and one of which was whether a company, a HUB Zone company in Detroit could or would bid on a contract in Hawaii. Well, I didn't pull that out of a hat. One of my clients' chief competitors is Cardinal Maintenance, which is a company based in Detroit that performs lots of janitorial contracts in Hawaii, and the fact is that most small businesses have to bid on contracts all over the country in order to get the work. They don't just bid locally. So I'm not just trying to raise a red herring here. I mean, this is a real problem, and as I pointed out in the brief, if you do a search where the contracting officer goes to see how many HUB Zones there are, there are a huge number of HUB Zones. There are hundreds of HUB Zones that are qualified in a lot of these small business codes. And if the test is a reasonable belief that there be two contractors, it's pretty hard for a contracting officer to do that search and find out that there are hundreds of them there and not determine that it's a reasonable probability they'll get two awards. As we saw in this one, we put in the bidder's list from this contract, and I think there are 31 HUB Zone companies asked for the plans in this case. So there is a lot of interest on the HUB Zones. I believe this case also shows one of the problems, which is they had two contracts. They set one aside for HUB Zones, didn't set the other one aside for HUB Zones, but there really was no reason they didn't set the second one aside. The same rules should have applied to it. So I don't know that SBA is really interpreting this as mandatory the way they say. They didn't in this case. As a matter of fact, in the record it says, we hope nobody else asks about the other contracts, because they were afraid that if somebody asked, then they have to, in fact, make it a HUB Zone. But if it's mandatory, they should have been doing that anyway. One of the questions was you have to have 35 employees. Again, it's another practical problem. Thirty-five percent. Thirty-five percent. What happens is if these contracts are awarded in areas that aren't HUB Zones, these are small businesses, if you only have 50 or 60 employees, you get a contract in an area where you get another 20 employees on that contract and you can't hire anybody in the HUB Zone, it disqualifies you from the HUB Zone program, because you now don't have 35 percent. And that is a problem, that companies qualify initially with the 35 percent, but they have difficulties maintaining that 35 percent, unless they can have places where they're hiring people that are working in the HUB Zones. So I just believe that the mandatory provision or the interpretation has worked to defeat Congress's intent rather than to carry it out of hiring people in these areas. Thank you. Thank you very much. Thank you for the fine argument, both of you. And the matter will be submitted.
judges: B. Fletcher, Thompson, Bea